UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION


MARSHANDRIUS THORNTON,           )
                                 )
              Plaintiff          )
                                 )
       v.                        )      Cause No.: 1:09-CV-145 RM
                                 )
ST. ANNE HOME OF THE DIOCESE     )
OF FORT WAYNE-SOUTH BEND, INC.   )
                                 )
              Defendant          )


<u>OPINION and ORDER</u>

Marshandrius "Shani" Thornton, an African-American female, worked as a Certified Nursing Assistant at St. Anne Home where she was mistreated by colleagues and eventually fired. St. Anne Home says Ms. Thornton was discharged for insubordination, which Ms. Thornton denies. Ms. Thornton now sues St. Anne Home claiming racial harassment, racial discrimination, and retaliation, all pursuant to Title VII, 42 U.S.C. § 1981, and Indiana civil rights law.

St. Anne Home moved for summary judgment on all claims, and moved to strike portions of Ms. Thornton's affidavit and to strike Bernard Pollard's affidavit. The court heard oral argument on June 24 and took these motions under advisement.

St. Anne Home argues that Ms. Thornton's affidavit, which was completed after her deposition was taken and after St. Anne Home filed its summary

judgment motion, contains speculation and contradicts her deposition testimony. Portions of Ms. Thornton's affidavit do involve speculation rather than personal knowledge, but the court can't agree that her affidavit contradicts her deposition testimony — rather, it simply adds to her testimony. Such affidavits presenting admissible evidence based on personal knowledge are a permitted method of presenting evidence of disputed material facts. Payne v. Pauley, 337 F.3d 767, 773 (7th Cir. 2003). The court denies the motion to strike Ms. Thornton's affidavit. The court will take into account the speculative nature of some of Ms. Thornton's assertions when analyzing St. Anne Home's summary judgment motion.

St. Anne Home argues that Bernard Pollard's affidavit lacks foundation in personal knowledge and is full of inadmissible hearsay. Bernard Pollard didn't work at St. Anne Home and he had no involvement in the events in this case except as they were allegedly communicated to him by his wife, JJuanne Pollard. Mr. Pollard's affidavit is mostly inadmissible hearsay to the extent anyone's out-of-court statements are offered as substantive evidence. His testimony is excluded from the evidence before the court to the extent it would constitute substantive evidence. *See* Gunville v. Walker, 583 F.3d 979, 985 (7th Cir. 2009) ("Admissibility is the threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment."). The court grants the motion to strike Bernard Pollard's affidavit.

Viewing the admissible evidence in Ms. Thornton's favor, a reasonable trier of fact could find that St. Anne Home discriminatorily discharged Ms. Thornton

from her job and retaliated against Ms. Thornton for telling Nursing Director Corrina Rees that her colleagues picked on her because of her race. But no reasonable trier of fact could find that Ms. Thornton's colleagues racially harassed her because the record wouldn't allow a trier of fact to find that the behavior was racially motivated or that it rose to the level of actionable harassment. Therefore, as explained in this opinion, the court grants in part and denies in part St. Anne Home's motion for summary judgment.

I. Background

The parties strongly dispute several material facts, but the court doesn't weigh the evidence here; instead, the court accepts Ms. Thornton's version of the facts as true for summary judgment purposes. Ms. Thornton worked for St. Anne Home during two distinct periods. Her first period of employment isn't at issue in this case, but it provides background. Shortly after completing her CNA training, Ms. Thornton began working at St. Anne Home in September 2004. She received three good performance evaluations with above-average scores. At the end of 2005, Ms. Thornton asked for her hours to be cut so she could focus on school at Ivy Tech. During summer 2006, Ms. Thornton worked at General Motors and worked only on-call hours at St. Anne Home. In September 2006 there was a misunderstanding in which Ms. Thornton was, without her knowledge, signed up to work but was a no-show. St. Anne Home terminated her for her absence.

Ms. Thornton called Director of Nursing Corrina Rees and Director of Human Resources Paulette Fleming to tell them she hadn't signed up to work the days she was marked absent. They told her to re-apply in six months, even though her termination notice indicated they wouldn't rehire her.

Ms. Thornton re-applied almost two years later in August 2008, and was hired at the hourly rate she had when her previous employment with St. Anne ended. Ms. Thornton was subject to the new employee 90-day probation period, just as when she was first hired in 2004. This second period of employment got off to a rocky start and never recovered.

In September 2008, two white CNAs on Ms. Thornton's floor — Ashley Platt and Christina Welz — began telling Ms. Thornton how to do her work incorrectly and telling her to perform tasks that weren't assigned to her. On September 22, Ms. Thornton complained to Director of Nursing Corrina Rees, telling her she thought they were picking on her because of her race. Ms. Rees came to Ms. Thornton's floor the next day and spoke to all employees on the floor, white and black, to tell them their behavior was inappropriate. Ms. Rees specifically called out Ms. Platt and Ms. Welz. This was an unusually strong action for Ms. Rees to take. Ms. Thornton testified:

> I told Corrina that they were harassing me because the next day she came up on the floor. If you just go to Corrina and say someone is picking on you, she's going to be, like, you know, suck it up. But she came up to the floor that next morning. This was at the end of the workday. That next day she came up to the floor and they said she's never done this before. She called every employee on [the] second

floor, every employee, into the med room, the medicine room or whatever you call it.

Thornton Dep., at 114. The others began to see Ms. Thornton as a tattletale and began to ignore her requests for help. About a week later Ms. Thornton told Ms. Rees that "things were getting worse, after her talk." Thornton Aff., at ¶ 15. Ms. Rees took no further action.

Ms. Thornton received a good 90-day review from Ms. Rees on December 2, but Ms. Rees extended Ms. Thornton's probation period by two months based on some absences and several tardies. Ms. Thornton had applied to work the shift starting at 7 a.m., but on her first day at work she was told she was to work the 6 a.m. shift. Ms. Thornton shared a car with her brother and couldn't get to work at 6 a.m., but she could get there by 6:15 or 6:30, and Ms. Rees had told her that would be fine. *See* Thornton Aff., May 3, 2010, at ¶¶ 16-17; Thornton Dep., at pp. 42-43, 49-50. At her review, Ms. Thornton reminded Ms. Rees that Ms. Rees had changed her schedule and Ms. Rees told Ms. Thornton to speak with Licensed Practical Nurse Teresa Stier, who corrected Ms. Thornton's schedule in the computer by the next day. *See* Thornton Dep., at p. 52. Ms. Thornton testified that she was taken off of probation at her year-end review shortly thereafter,[1] but at

---

[1] Ms. Thornton testified that Ms. Rees took her off of probation at her year-end review, which was filled out on December 12, 2008 and signed by Ms. Thornton on December 17, 2008.

| | |
|---|---|
| Q: | Your probation was extended, was it not? |
| A: | Oh, yes. |
| Q: | And it was never not [sic] revoked the next day; somebody didn't come back to you the next day and say you're no longer on probation? |
| A: | She took me off of probation in December. |
| Q: | Who did? |
| A: | Corrina did when she gave me my end-of-the-year evaluation. Yes, she did. |

Thornton Dep., at p. 52.

oral argument both parties represented that Ms. Thornton was on extended probation through the remainder of her employment.

On December 11, Ms. Thornton had a "verbal counseling" meeting with Ms. Rees and Abbe Davison, her direct supervisor, about patient care. A patient's daughter had complained that her mother wasn't being properly toileted. Investigation revealed that Ms. Thornton was working during two of the three incidents. Ms. Thornton explains that the "resident's plan" given to her indicated that the patient took herself to the restroom and didn't indicate that the patient was on a toileting program, so it was a misunderstanding caused by incorrect patient records. An unidentified CNA was responsible for the third reported incident but didn't receive a counseling session.

The next day, December 12, Ms. Rees filled out Ms. Thornton's evaluation for 2008.[2] Ms. Thornton received a 3.53% raise, commensurate with other employees' raises. The evaluation is comparable to those Ms. Thornton received during her first period of employment: it is generally unremarkable with above-average scores and with some areas for improvement indicated. Ms. Thornton was satisfied with her job review, stating, "I performed my job well and received a nearly perfect score on my job evaluation." Thornton Affidavit, at ¶ 38.

Tension was building in Ms. Thornton's relationship with her supervisor, Abbe Davison, who favored Ms. Platt and Ms. Welz. On December 20, Ms.

---

[2] Ms. Thornton signed the evaluation on December 17, 2008.

Thornton arrived at work, helped feed residents in the back dining room, and proceeded to help the other LPN and supervisor on her floor, JJuane Pollard, who is also African-American. Ms. Pollard asked Ms. Thornton to help her feed one of her patients through a feeding tube. Ms. Thornton did so, but the patient had an accident and Ms. Thornton stepped in the patient's feces. Ms. Thornton went to go clean it up when Ms. Davison saw her and asked her why she wasn't working. Ms. Thornton explained what had happened, but Ms. Davison said to the other nurses a couple times, "Hey, does it piss any of you off that Shani is not doing any work?" Ms. Thornton told Ms. Davison not to speak to her like she was her child. Ms. Davison said, "I don't have to put up with your shit," then told Ms. Thornton to clock out and leave.

LPN Teresa Stier and St. Anne Home Administrator Mary Haverstick decided to fire Ms. Thornton on the phone two days later, on December 22. Ms. Rees was away on vacation when this decision was made and she had no involvement with this decision. The record doesn't indicate that Ms. Davison had any say in the decision to terminate. Thornton's termination notice says she was "terminated for insubordination" — specifically, she "refused a direct order from her charge nurse." Def.'s Exhibit B [Doc. No. 27-1]. Ms. Thornton denies receiving any direct orders from Ms. Davison in this exchange and consequently denies disobeying any direct orders.[3]

---

[3] St. Anne Home claims that Ms. Thornton was belligerent and defiant on the phone with Ms. Stier and Ms. Haverstick, and that they only decided to terminate Ms. Thornton after her post-insubordination (to Ms. Davison) belligerence. However, the record made at the time of Ms.

In October 2008, St. Anne Home terminated another probationary employee, Tiffany Gordon, who is white. Ms. Gordon was incompetent to the point of insubordination. St. Anne Home supervisors gave her a chance to improve by moving her to another floor where residents were more alert and she could receive more supervision. Ms. Gordon didn't improve and she was then fired. Her termination notice states:

> Concerns from co-workers who were orienting her. She did not stay with the person who tried to [illegible] her. Kept disappearing. Did n/ listen to what the residents had to say about their care. Nor did she pay attention to the nurses. Did what she wanted even after I talked to her about concerns with resident care and moved her off the Dementia floor to 1st floor.

Pl.'s Exhibit M [Doc. No. 29-1].

## II. ANALYSIS

In reviewing St. Anne Home's summary judgment motion, the court doesn't weigh the evidence but rather accepts the evidence Ms. Thornton has presented and construes all facts, and draws all reasonable inferences from those facts, in favor of Thornton, the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Clay v. Holy Cross Hospital, 253 F.3d 1000, 1005 (7th Cir. 2001). Courts assess motions for summary judgment using only evidence admissible at trial. Gunville v. Walker, 583 F.3d 979, 985 (7th Cir. 2009).

---

Thornton's termination only indicates insubordination — the incident with Ms. Davison — as the reason for termination and the court accepts only insubordination (and not post-insubordination belligerence) as St. Anne's stated reason for terminating Ms. Thornton. Whether the phone call played any part is a question for the trier of fact.

Judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED R. CIV. P. 56(c). A fact is "material" if it might affect the outcome of the litigation under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes over material facts are "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The evidentiary standard is the same that would apply at a trial on the merits, so Ms. Thornton must present enough competent evidence in rebuttal of St. Anne Home's motion that a reasonable jury could find by a preponderance of the evidence that Ms. Thornton has prevailed on her claims. See id. at 252; Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmovant must provide evidence beyond the pleadings setting "forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Summary judgment is the time when a plaintiff must come forward with enough evidence to convince a trier of fact of her version of the facts: as the court of appeals has put it, it is the "put up or shut up" moment of the lawsuit. Johnson v. Cambridge Industries, Inc., 325 F.3d 892, 901 (7th Cir. 2003).

Ms. Thornton alleges racial harassment, racial discrimination, and retaliation, all in violation of Title VII, 42 U.S.C. §1981, and Indiana law. Section 1981 claims are evaluated under the same rubric as Title VII claims, so the court evaluates Ms. Thornton's claims together under their common rubric. Herron v. DaimlerChrysler Corp., 388 F.3d 293, 299 (7th Cir. 2004). Indiana courts look to federal law for guidance in construing Indiana's civil rights laws, so Ms. Thornton's Indiana claims rise and fall with her federal claims. *See, e.g.*, Filter Specialists, Inc. v. Brooks, 906 N.E.2d 835, 839 (Ind. 2009).

### *1. Racial Harassment / Hostile Work Environment*

Ms. Thornton argues she suffered racial harassment and a hostile work environment at St. Anne Home. To succeed on this claim, Ms. Thornton must show (1) she was subject to unwelcome harassment; (2) the harassment was based on her race; (3) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive working environment that seriously affected her psychological well-being; and (4) there is a basis for employer liability. Herron v. DaimlerChrysler Corp., 388 F.3d 293, 302 (7th Cir. 2004). Ms. Thornton must show the objectionable environment was both subjectively and objectively offensive, or, to use another method, that the harassing words or conduct were severe or pervasive. Id.

Ms. Thornton's argument suggests that for the second element — harassment being based on her race — it's enough that she is black and Ms. Platt

and Ms. Welz are white, and that the burden rests on the defense to show their treatment of her was personal and not racial. This isn't the law. Ms. Thornton must present something to show that their treatment of her was based on her race and not personal: the law doesn't simply assume racial animus is the guiding principle in people's actions. Ms. Thornton must point to evidence from which a factfinder could infer that Ms. Platt and Ms. Welz gave her bad work instructions, at least in part, because she is African-American. *See* Beamon v. Marshall & Ilsley Trust Co., 411 F.3d 854, 863-864 (7th Cir. 2005) ("The 'harassment' of which Beamon complains could just as readily have been perpetrated upon a white person without any alteration in its character or purpose. Accordingly, we cannot reasonably construe M&I's actions as being motivated by hostility to Beamon's race. The district court rightly concluded that Beamon failed to present evidence sufficient to survive summary judgment on his hostile work environment claim."); Herron v. DaimlerChrysler Corp., 388 F.3d 293, 302-303 (7th Cir. 2004) ("Herron points to a number of problems he experienced at KTP and suggests they were racially based because white supervisors did not have the same problems. Herron does not show any connection between these occurrences and his race. His problems were not related to his race-they were related to him. The fact that he is a member of a protected class does not transform them. This alone dooms his racial harassment claim."); *see also* Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 345-346 (7th Cir. 1999) (woman had door closed in her face, was startled by being approached without warning, was cut off in parking lot, and subjected to

abusive language such as "get your head out of your ass" but "these events cannot be seen as having racial or gender overtones, and nothing suggests they were motivated by discrimination."); Adusumilli v. City of Chicago, 164 F.3d 353, 362 (7th Cir. 1998) ("It is well established in this Circuit that there is a safe harbor for employers in cases in which the alleged harassing conduct is too tepid or intermittent or equivocal to make a reasonable person believe that she has been discriminated against on the basis of her sex."); Johnson v. Hondo, Inc., 125 F.3d 408, 412 (7th Cir. 1997) (man made sexually graphic and crude comments to male colleague, but "[b]esides the sexual content of Hicks' remarks there is absolutely nothing in this record that supports a reasonable inference that the remarks were directed at Johnson on account of his gender."). One way Ms. Thornton can show this is to show how the behavior of others can be "reasonably construed" as arising from hostility toward her race. Shanoff v. Ill. Dept. of Human Services, 258 F.3d 696, 704 (7th Cir. 2001).

Ms. Thornton hasn't presented anything to allow the behavior of Ms. Welz and Ms. Platt to be reasonably construed as arising from racial hostility. Ms. Thornton's testimony demonstrates her subjective, uncorroborated belief that they picked on her because of her race. There were, by Ms. Thornton's count, five other black employees on her floor and between twelve and fifteen black employees at St. Anne's while she worked there. *See* Thornton Dep., at 102-103.

> Q:     Were Christina and Ashley just picking on you or were they
>        picking on the other black employees as well?
> A:     Just me.

| | |
|---|---|
| Q: | Why were they just picking on you? |
| A: | I don't know. You would have to ask them. I have no idea. |
| Q: | Were they picking on you because you were black? |
| A: | Yes. |
| Q: | What evidence do you have of that? |
| A: | I mean, they didn't pick on anyone else and – |
| Q: | Well, you just told me they didn't pick on any of the other black employees either. |
| A: | I mean but the other black employees also did not work with them. |
| Q: | So they didn't pick on the other black employees because they didn't work with them? |
| A: | No. |
| Q: | Do you have any other evidence or any witnesses to these actions by Christina and Ashley? |
| A: | Besides JJ? |
| Q: | Yes. |
| A: | Not that I can recall. |

Thornton Dep., at 103-104. Ms. Thornton says they picked only on her, and not other black employees, because they didn't work with other black employees. This asks the court to assume what the law does not: that her race, and not personality conflicts, is why they mistreated her. The record contains no evidence to support an inference that race had anything to do with their behavior; nothing in the record indicates anything more than employees who didn't like each other.

Additionally, the behavior alleged here doesn't rise to actionable harassment. Ms. Thornton argues for a more liberal understanding of what constitutes actionable harassment: that it is enough for the others' behavior to have "affected" her work. The law requires more than interpersonal unpleasantness that "affects" an employee's work before harassment is actionable. To determine if harassment is actionable, courts look to the totality of the

circumstances, "including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." Herron v. DaimlerChrysler Corp., 388 F.3d 293, 303 (7th Cir. 2004). Put simply, harassment needs to make the workplace "hellish" to be actionable. *See* id. (quotations omitted); *see also* Cooper-Schut v. Visteon Automotive Systems, 361 F.3d 421, 427 (7th Cir. 2004) ("A hostile environment is one that is permeated with discriminatory intimidation, ridicule and insult." (quotation omitted)). The behavior of the CNAs and Ms. Davison's statement, "I don't have to take your shit," don't rise to the level of a "hellish" workplace. *See* Patton v. Indianapolis Public Sch. Bd., 276 F.3d 334, 339 (7th Cir. 2002) (noting that "many employees have to put up with some amount of rude, arrogant, or boorish behavior at work" including from supervisors). However widely the court construes the law, St. Anne Home in 2008 was an unpleasant place for Ms. Thornton, and her work was affected, but the childish unprofessionalism that transpired here was not severe or pervasive. Summary judgment is granted for St. Anne Home on Ms. Thornton's racial harassment claim.

### 2. Racial Discrimination / Disparate Treatment

To succeed on her racial discrimination claim, Ms. Thornton must show that St. Anne Home engaged in intentional discrimination against her, having a discriminatory motive behind its treatment of her. Ms. Thornton can proceed

under the direct or indirect methods of proof, but "the bottom line is the same: a plaintiff must show a discriminatory motive either with some evidence that is incriminating in itself [direct method] or by ruling out other plausible motives for the adverse employment action [indirect method]." Maldonado v. U.S. Bank, 186 F.3d 759, 763 (7th Cir. 1999). Ms. Thornton relies on the indirect method.

The indirect method of proof requires Ms. Thornton to set forth a *prima facie* case of discrimination and then involves a burden-shifting pretext analysis, as first outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973). To set out a *prima facie* case of discrimination, Ms. Thornton must show (1) she is a member of a protected class; (2) she was meeting St. Anne Home's legitimate expectations; (3) St. Anne Home took an adverse employment action against her; and (4) St. Anne Home treated similarly situated individuals outside of the protected class more favorably. Herron v. DaimlerChrysler Corp., 388 F.3d at 299.

Once a plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its treatment of the plaintiff. If such a reason is given, the plaintiff can defeat a summary judgment motion only by showing that the reason is pretext for intentional discrimination. Pretext means the "reason put forth was not a true reason . . . a dishonest explanation, a lie rather than an oddity or an error." Herron v. DaimlerChrylser Corp., 388 F.3d at 299. The ultimate burden to prove intentional discrimination always rests with Ms. Thornton. *See, e.g.*, Greene v. Potter, 557

F.3d 765, 768-769 (7th Cir. 2009) (quoting <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 143 (2000)).

Ms. Thornton has set forth a *prima facie* case of disparate treatment. Ms. Thornton is a member of a protected class and her year-end review in 2008 would allow a jury to believe she met St. Anne Home's legitimate expectations. The extension of Ms. Thornton's probation and her termination were adverse employment actions because they materially affected her terms of employment. The court can't agree with Ms. Thornton that her verbal counseling session was an adverse employment action. An adverse employment action must be materially adverse, and not just something unpleasant. *See* <u>Kersting v. Wal-Mart Stores, Inc.</u>, 250 F.3d 1109, 1118-1119 (7th Cir. 2001). A written warning or even two warnings don't, by themselves, constitute materially adverse employment actions. <u>Id.</u>

To be similarly situated, a comparator must be comparable to Ms. Thornton in all material respects. <u>Crawford v. Indiana Harbor Belt RR Co.</u>, 461 F.3d 844, 846 (7th Cir. 2006). Material points of comparison in Ms. Thornton's situation involve race, supervision under Ms. Rees, Ms. Davison, Ms. Flemming, and/or Ms. Haverstick, *see* <u>Radue v. Kimberly-Clark Corp.</u>, 219 F.3d 612, 617-618 (7th Cir. 2000), probation, and St. Anne Home's actions following the employee's insubordination.

Ms. Thornton presents Richard Evans, Ashley Platt, and Tiffany Gordon as comparators. Ms. Thornton alleges in her affidavit that Richard Evans and Ashley

Platt are white, were insubordinate, and were treated better — Mr. Evans was moved to another floor and Ms. Platt was transferred to a different position, resulting in increased pay. Thornton Aff. ¶¶ 35, 36. They can be comparators only if Ms. Thornton was no longer a probationary employee because these two employees appear to have been past their probationary employment periods. Assuming Ms. Thornton's testimony is correct, and her representations to the court were mistaken (that is, assuming she was taken off probation in December 2008), then the problem with these two proposed comparators is that Ms. Thornton's statements about them aren't based on personal knowledge and are speculative.[4] Ms. Thornton's counsel represents that she has their personnel files showing they were insubordinate but received better treatment. But personnel files aren't part of the summary judgment record: before the court are only Ms. Thornton's generic statements and no reason for why she would have personal knowledge of these alleged events or of the contents of these personnel files. As stated before, summary judgment is the time when Ms. Thornton must present all her evidence to the court. Ms. Thornton presents no evidence concerning these two employees beyond her speculative statements. Mr. Evans and Ms. Platt aren't true comparators based on the record before the court.

---

[4] St. Anne Home cites portions of Ms. Thornton's deposition where she allegedly admits her lack of personal knowledge, but neither party presented these portions of Ms. Thornton's deposition to the court. As a clarification, the court is not basing its ruling on St. Anne Home's unsubstantiated argument stemming from deposition testimony not before the court.

Tiffany Gordon, however, is a true comparator. Ms. Gordon was a white probationary employee who was incompetent to the point of insubordination. St. Anne Home moved Ms. Gordon to another floor after Ms. Gordon wouldn't listen to her fellow nurses and did whatever she pleased. St. Anne Home fired Ms. Gordon only after she didn't improve on that new floor. Ms. Thornton was given a chance to improve her attendance record in the form of an extension of her probation. Ms. Thornton wasn't given a chance to improve after her alleged insubordination toward Ms. Davison, so she was treated less favorably than Ms. Gordon.

Ms. Thornton has presented a genuine issue of material fact for the pretext analysis. St. Anne Home says she was terminated because of insubordination, specifically, refusing a direct order from Ms. Davison. Ms. Thornton denies in her sworn testimony that she refused a direct order. This raises a material question of fact whether St. Anne Home's stated reason for terminating Ms. Thornton is a lie or the true reason for her termination. *See* <u>Forrester v. Rauland-Borg Corp.</u>, 453 F.3d 416, 418 (7th Cir. 2006).

Ms. Thornton has made out a *prima facie* case of disparate treatment and she has demonstrated a genuine issue of material fact whether St. Anne Home's stated reason for terminating her is pretext. A rational trier of fact could find that Ms. Thornton received disparate treatment in the form of discriminatory discharge because of her race. St. Anne Home's motion for summary judgment on this claim is denied.

*3. Retaliation*

Ms. Thornton focuses her claim of retaliation on the direct method of proving retaliation under Title VII and § 1981, but in their arguments before the court, both parties refer (even if fleetingly) to the indirect method of proving retaliation, so the court reads Ms. Thornton's argument as also including the indirect method of proof. Under the direct method, Ms. Thornton must show (1) she engaged in a statutorily protected activity; (2) St. Anne Home took an adverse employment action against her; and (3) there's a causal connection between the two. Herron v. DamilerChrysler Corp., 388 F.3d 293, 301 (7th Cir. 2004); Williams v. Waste Management of Ill., Inc., 361 F.3d 1021, 1031 (7th Cir. 2004). Ms. Thornton claims that what she calls her "formal complaints of discrimination" met with retaliation, as shown in her counseling session, the extension of her probationary period of employment, and her termination from St. Anne Home. As explained above, her counseling session wasn't an adverse employment action.

No reasonable trier of fact could find a direct causal connection between Ms. Thornton's September 2008 complaints of harassment and the extension of Ms. Thornton's probation or termination in December 2008. Ms. Thornton calls this two-month period suspicious timing, but "suspicious timing alone rarely is sufficient to create a triable issue" of fact. Kodl v. Bd. of Educ. Sch. Dist. 45, Villa Park, 490 F.3d 558, 563 (7th Cir. 2007) (quotation omitted); *see also* Tomanovich v. City of Indianapolis, 457 F.3d 656, 665 (7th Cir. 2006) (finding two month time

period insufficient by itself to establish causal connection between statutorily protected activity and adverse employment action).

To prove retaliation under the indirect method, Ms. Thornton must set forth a *prima facie* case, showing that (1) she engaged in statutorily protected activity; (2) she met St. Anne Home's legitimate expectations; (3) she suffered an adverse action taken by St. Anne Home; and (4) she was treated less favorably than similarly situated employees who didn't engage in statutorily protected activity. Tomanovich v. City of Indianapolis, 457 F.3d 656, 663 (7th Cir. 2006). Once the *prima facie* case is set out, the burden shifts to St. Anne Home to present evidence of a non-discriminatory reason for its employment action. The burden then shifts back to Ms. Thornton to demonstrate that St. Anne Home's stated reason is pretext. Id.

Ms. Thornton engaged in statutorily protected activity when she complained twice to Ms. Rees that she was being racially harassed. Ms. Thornton met St. Anne Home's legitimate expectations, and Ms. Thornton received an extension of probation during which she was terminated for alleged insubordination. For the reasons already stated, Tiffany Gordon is a true comparator. She was a white employee who didn't engage in statutorily protected activity and who was treated more favorably than Ms. Thornton after alleged insubordination. Ms. Thornton has set out a *prima facie* case of retaliation under the indirect method. Also, as already discussed, Ms. Thornton presents a genuine issue of material fact whether St. Anne Home's stated reason for terminating her is pretext.

*c. Conclusion*

The court GRANTS in part and DENIES in part St. Anne Home's motion to strike [Doc. No. 33], and GRANTS in part and DENIES in part St. Anne Home's motion for summary judgment [Doc. No. 27]. Summary judgment is granted for St. Anne Home on Ms. Thornton's racial harassment claim. Ms. Thornton's disparate treatment and retaliation claims under federal and Indiana state law shall proceed to trial.

SO ORDERED.

ENTERED: July 13, 2010

/s/ Robert L. Miller, Jr.
Judge
United States District Court

21